IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RONALD McGREGOR,<br><br>Defendant.<br>———————————————————/ | No. CR 12-00200 WHA<br><br>**ORDER DENYING MOTION TO SUPPRESS** |

**INTRODUCTION**

In this criminal prosecution charging defendant with being a felon in possession of a firearm, defendant moves to suppress evidence under the Fourth Amendment. For the reasons stated below, defendant's motion is **DENIED**.

**STATEMENT**

Defendant Ronald McGregor filed a motion to suppress evidence seized by officers of the San Francisco Police Department. An evidentiary hearing was held to resolve conflicting factual issues. To make clear the ground rules, all agreed and the Court so ordered at the outset (and again at the end) that only the record created at the hearing would be the record for decision and that declarations and reports previously filed would not be unless moved into evidence at the hearing. At the hearing, the government presented testimony from three SFPD officers. For the defense, defendant's sister and the building manager of 152 Harbor Road, the dwelling at issue, testified. The following are the Court's findings following the evidentiary hearing.

After running in and then out of his sister's apartment, defendant Ronald McGregor was arrested. The arrest was made by SFPD officers Steven Benzinger, Anthony Ravano, and Gabriel Rivera. The apartment was located in the 100 block of Harbor Road in the Bayview District of San Francisco. The area was (and remains) known as one with frequent violent crimes, including homicides, firearms shootings, and assaults with firearms (Tr. 13–14, 196,

1   277–79). The area was (and remains) gang-infested with frequent narcotics trafficking (*id.* at 14,
2   49,198).

3       On the evening of January 28, 2012, Officers Benzinger, Ravano, and Rivera were
4   patrolling in the Bayview District. The officers were patrolling in an unmarked black Ford
5   Crown Victoria automobile, a car which Officers Rivera and Benzinger testified was closely
6   associated with police (*id.* at 198–200, 279). The officers were wearing plainclothes, although
7   each officer had his police badge visibly displayed on the exterior of his clothing.

8       At approximately 7:25 p.m., the officers turned onto Harbor Road, heading east. The
9   officers were driving slowly, at their "typical patrol speed" of around 15 to 20 miles per hour
10  (Tr. 283). As the officers drove down Harbor Road, they saw defendant walking alone on the
11  sidewalk. According to defendant's sister, Avonna Clark, defendant was returning to her
12  apartment at 152 Harbor Road after walking to a nearby house to buy a cigarette (*id.* at 350).
13  Below is a photograph of the sidewalk outside 152 Harbor Road, taken from Exhibit C-3. The
14  apartment is located at the top of the staircase on the left. The circle marked "RM1" indicates
15  where defendant was standing when the officers first spotted him.

**Exhibit C-3**



1  When the officers initially spotted defendant, defendant was walking west. As the officers drew
2  closer, they saw defendant stop and walk briefly in the opposite direction (*id.* at 44, 206, 208,
3  284). Defendant behaved as if he had seen their vehicle immediately prior to turning around.
4  They saw him bend down briefly behind a parked car and stand back upright (*id.* at 44, 206–07,
5  287). The officers were able to observe defendant clearly because the immediate area was
6  illuminated by a street lamp and their vehicle's headlights and defendant was the only person on
7  the sidewalk.

8  To the officers, defendant's conduct, upon noticing suspected police, suggested that he
9  may have been contemplating discarding contraband or a firearm (*id.* at 136–37, 208–09, 288).
10  Officer Benzinger, at the wheel, testified that he was "a little suspicious" of defendant, but felt
11  he did not "have enough legally to detain [defendant] at that point" (*id.* at 288). Officer
12  Benzinger pulled up and stopped the vehicle in front of 152 Harbor Road. At that time,
13  defendant was standing on the sidewalk and near the steps leading up to 152 Harbor Road.
14  Through the open window of the patrol car, Officer Benzinger asked defendant: "Hey, what's
15  going on?" (*id.* at 51, 288). Defendant made eye contact with him. Defendant then grabbed the
16  front of his own coat, at which point Officer Benzinger observed a bulge in defendant's coat (*id.*
17  at 289, 321–22, 332). Defendant then ran "extremely fast" up the steps leading to the apartment
18  at 152 Harbor Road (*id.* at 289).

19  While this was happening, the other two officers exited the car. The officers began to
20  chase defendant (*ibid.*). Officers Ravano and Rivera each yelled "Stop! Police!" while defendant
21  was running away (*id.* at 52, 212, 290–92). Defendant nonetheless continued running up the
22  stairs. Without using a key, defendant opened the door of 152 Harbor Road and entered the
23  apartment. After defendant ran into the apartment, the door shut behind him.

24  Officer Rivera then grabbed the handle of the door, turned it, and pushed the door open
25  with his shoulder. The officer felt resistance, as if someone was behind the door and pushing
26  against it. Officer Rivera pushed the door open with no damage to the door or door jamb.
27  Photographs of the door and locking mechanism taken that night show no damage. Inside the
28  apartment, the officers saw women and children.

3

Officer Rivera saw defendant on the other side of the living room, the first room encountered upon entry. Defendant was close to and headed out a sliding glass door that opened onto an outside deck. The officer again told defendant to stop (*id.* at 219). Defendant opened the sliding glass door and ran onto the deck . Defendant then turned right and jumped over the deck railing onto an adjacent roof a few feet above the deck level. He moved around the exterior of the building and onto another small roof that projected from the side of the building. By this point, Officer Benzinger was positioned on the outside (having never entered the apartment) and was standing on the ground next to the building. He trained his weapon on defendant and told him "I know you have a gun. Just put it down slowly" (*id.* at 299). In response, defendant eventually removed a gun from his jacket and threw it into the air and down the hill behind the building. The gun was subsequently recovered by the police from the back yard of a residence one street over.

Defendant was eventually assisted off the roof and taken into custody. Officer Ravano attempted to get statements from the occupants of the apartment, none of whom cooperated. The officer also searched the area where they had seen defendant stoop briefly on the sidewalk, but found no contraband or weapons (*id.* at 189). The apartment was not searched and none of the occupants was arrested.

Defendant is now charged with felon in possession of a firearm under 18 U.S.C. 922(g)(1). Defendant moves to suppress the gun as seized pursuant to an unlawful search and seizure. For the reasons stated below, the motion to suppress is **DENIED**.

## ANALYSIS

It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotation and citation omitted). The warrant requirement is subject to two exceptions, namely the "emergency exception" and the "exigency exception."

As an initial matter, the government argues that, because defendant was arrested on a roof ledge outside of the apartment, there was no search or seizure "inside" a home. This order disagrees. Two officers chased defendant through the apartment in question. In order to

4

lawfully cross the threshold of the doorway and into the apartment, the officers must either satisfy the Fourth Amendment's warrant requirement for searches of homes or establish that an exception applies.

Under the emergency exception, "the need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Ibid.* (internal quotation and citation omitted). The Supreme Court has emphasized that an officer's subjective motives or beliefs are not relevant. The question is whether the circumstances, viewed objectively, justify the action. *Id.* at 404. Probable cause is not required to invoke the emergency exception; rather, it applies when officers had "an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm." *United States v. Snipe*, 515 F.3d 947, 951–52 (9th Cir. 2008).

Under the exigency exception, officers may enter a home without a warrant "if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is 'necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.'" *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (quoting *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009)) (internal citation omitted). Probable cause exists when "officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "Under the collective knowledge doctrine, in determining whether probable cause exists for arrest, courts look to 'the collective knowledge of all the officers involved in the criminal investigation.'" *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008) (quoting *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007)).

This order finds that the officers' warrantless entry into the apartment was justified under the emergency exception. Accordingly, defendant's motion to suppress is **DENIED**.

5

### 1. DEFENDANT HAS STANDING TO CHALLENGE ENTRY INTO THE APARTMENT.

The government contends that defendant did not have a legitimate expectation of privacy in his sister's apartment, arguing that Clark's "bald assertions" are entitled to little weight. To contest the legality of a search under the Fourth Amendment, a "defendant must demonstrate a legitimate expectation of privacy in the place or item searched by showing an actual subjective expectation of privacy which society is prepared to recognize." *United States v. Davis*, 932 F.2d 752, 756 (9th Cir. 1991). An overnight guest has an expectation of privacy in the home "that society is prepared to recognize as reasonable." *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990). In determining whether a defendant has an reasonable expectation of privacy in the home of another person, our court of appeals has considered factors such as whether the individual has been given permission to come and go freely, had a key, previously lived in the home, had independent access to the place searched, or paid a portion of rent. *Davis*, 932 F.2d at 757.

The apartment at 152 Harbor Road was leased by defendant's sister, who had lived there for three years. Clark testified at the hearing that defendant often slept at her apartment and was a frequent visitor. Defendant kept clothes and toiletries at the apartment, had a key, and could come and go as he pleased. Defendant often stayed overnight at the apartment for days or weeks at a time. Notably, Clark did not state that defendant planned to stay at her apartment on the night in question.

Clark's testimony on this topic is accepted. Based on the circumstances, including the fact that defendant spent large amounts of time at the apartment, both for short visits and as an overnight guest, and the close familial relationship as siblings, defendant has adequately established that he had a legitimate expectation of privacy in his sister's apartment.

### 2. THE EMERGENCY EXCEPTION APPLIES.

In *Snipe*, our court of appeals applied the Supreme Court's decision in *Brigham City* and adopted a two-pronged test to determine if the emergency exception is met:

> (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and
> (2) the search's scope and manner were reasonable to meet the need.

6

*Snipe*, 515 F.3d at 952. Determining whether an entry is objectively reasonable is a fact-specific inquiry based on an examination of the totality of the circumstances as they appeared to the officers. *Id.* at 953 (citing *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

Here, the officers were patrolling at night in a high-crime area known for gang violence, narcotics trafficking, and aggravated assaults with firearms. All three officers were familiar with the area through their work as SFPD officers. The officers observed defendant react to their approaching vehicle (a vehicle closely associated with the police) by stopping and turning in the other direction, then ducking down briefly behind a parked car. In the officers' experience, defendant's actions signaled an attempt to discard contraband or firearms, or at least a contemplation of doing so. The officers then attempted to contact defendant by addressing him through the window of the vehicle. Defendant checked the front of his coat, another reaction known by officers as habitual among gun-carrying individuals when confronted by police (Tr. 276–77). This action revealed a bulge in his coat indicative of a gun. Defendant then took off running up the stairs of the nearest apartment building. Although the officers shouted at him to stop and identified themselves as police, defendant did not halt his headlong flight. At this point, officers had more than enough reasonable, particularized suspicion that defendant was engaged in criminal activity to justify detaining defendant, and specifically had reasonable suspicion that defendant possessed a firearm or narcotics. *See United States v. Smith*, 633 F.3d 889, 894 (9th Cir. 2011).

Defendant bolted through the front door as if it were unlocked or slightly ajar. He did not use a key. The officers did not know defendant, or whether he had a connection to the apartment. As far as the officers could tell, defendant had bolted into a random, close-by home of a stranger to seek escape from the officers, hide contraband, or endanger the occupants. Based on the foregoing information known to the officers, it was objectively reasonable for the officers to conclude that defendant's frenzied escape into the apartment posed a random and serious risk to the safety of the occupants or the officers. There was no particular indication that defendant lived there or knew the occupants. He did not say, for example, "Go away. This is

my home." He did not enter using a key. Nor did the sister, who was standing inside near the door communicate in some manner to the police that defendant belonged there.

As in *United States v. Arellano-Ochoa*, 461 F.3d 1142, 1146 (9th Cir. 2006), a defendant's "furtive" movements may contribute an officer's reasonable conclusion that the defendant posed a risk to the safety of law enforcement and others nearby. In *Arellano-Ochoa*, a border patrol agent went to the defendant's dwelling based on information that an illegal alien likely resided at that address. As the agent went to knock, a man came toward the door. Instead of talking to the officers, the man swung the door almost shut and dodged out of sight behind it. The officers then saw the blinds at the front window shut. Our court of appeals held that the officers were justified in entering the dwelling due to the exigent circumstances, stating:

> [defendant's] quick dodge behind the door and closing of the blinds made it reasonable for the officers to conclude that there was a likelihood of danger to themselves, the woman, and the children. Arellano–Ochoa did not say "I prefer not to talk with you" or "You may not come in." He acted rather than talking. And he acted in a way that would suggest, even before they saw the gun, that the officers faced a risk of bullets flying where officers, a woman, and her toddlers were all within range.

*Ibid.* Similarly, in this case, defendant's furtive gestures and headlong flight up the stairs of the nearest building and apparent random entry into a home reasonably gave rise to concern for the safety of the occupants and officers.

Defendant argues that the manner in which the officers chased defendant and entered the apartment negates a conclusion that officers feared for their own safety. As discussed above, the safety of the occupants was also a serious concern (Tr. 56, 215, 218). Merely because the officers gave chase and did not enter the apartment with their guns unholstered does not indicate that they subjectively believed the situation was not exigent.

Defendant contends that the circumstances in this case are similar to those in *Sims v. Stanton*, — F.3d —, 2012 WL 5995447 (9th Cir. Dec. 3, 2012). In *Sims*, a Section 1983 case, our court of appeals considered whether an officer was justified in kicking down the front gate of a house, resulting in injury to the plaintiff. The officer was called to investigate a disturbance involving a baseball bat, which occurred around one a.m. in an area associated with gangs. In

1    that case, the officer had no information tying Patrick, the arrestee, to the reported disturbance
2    and did not see Patrick carrying a baseball bat or any other weapon. The only facts even
3    suggesting suspicious behavior were that Patrick crossed the street and quickly walked or ran
4    toward the house. The officer ordered him to stop, but Patrick went through the front gate of the
5    house without stopping. The court of appeals found that the officer had no particularized facts
6    relating to Patrick, and knew only that the area had gangs and that gang members were often
7    armed. Thus, the officer's baseless speculation that Patrick may have gone into the house to arm
8    himself or that someone in the house might interfere with Patrick's arrest was "too generalized
9    and speculative to provide an 'objectively reasonable basis' for fearing that violence might be
10   imminent." *Id.* at *6.

11         The facts of the instant case, however, are markedly different. Defendant's furtive
12   gestures, indicative of a weapon, his response to the officers' attempt to contact him, and his
13   headlong flight into the nearest house are circumstances that, when viewed together, establish
14   that it was objectively reasonable for officers to conclude that defendant's entry into the house
15   posed an immediate threat to the safety of the occupants and officers. Put differently, if the
16   police had stopped at the threshold and taken the time to seek a warrant and if the intruder had
17   indeed been armed and used the extra time to take the occupants hostage, the police would have
18   been pilloried in our community for being so blasé about public safety. We now know that
19   defendant was not a stranger to the occupants and would not have harmed them, but the officers
20   did not then have the luxury of hindsight and had to act based on the objective risks and
21   circumstances as reasonably perceived by them at the time.

22         Under the second prong of the emergency exception analysis, the scope and manner of
23   the search must be reasonable to meet the need. *Snipe*, 515 F.3d at 952. Officer Rivera turned
24   the handle of the door, which was unlocked, and pushed the door open with his shoulder. He did
25   not knock and announce himself prior to doing so. Under the circumstances, however, where
26   officers were in pursuit of a fleeing suspect, the failure to stop, knock, and wait for a response
27   was justified. While in hindsight it would have perhaps been preferable if officers had first
28   knocked, the officers believed that moving quickly was important in this situation, because

defendant could have taken an offensive position to attack police officers, or threaten occupants. *See Wilson v. Arkansas*, 514 U.S. 927, 936 (1995) (holding that "although a search or seizure of a dwelling might be constitutionally defective if police officers enter without prior announcement, law enforcement interests may also establish the reasonableness of an unannounced entry[,]" and leaving to the lower courts "the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment"). After officers entered the apartment, they announced themselves as police. They spotted defendant exiting the apartment through the sliding glass door and pursued him out of the apartment. No search of the apartment was conducted. None of the occupants were arrested or searched. While the occupants were questioned, they were not required to give statements (and in fact none of them did so). Under the circumstances, this order finds that the manner and scope of the warrantless entry and pursuit of defendant was reasonable.

## CONCLUSION

Because the officers' warrantless entry was justified under the emergency exception, defendant's motion to suppress is **DENIED**.

**IT IS SO ORDERED.**

Dated: December 21, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE